# UNITED STATES DISTRICT COURT
for the
Northern District of Texas

**FILED**
**July 7, 2020**
KAREN MITCHELL
CLERK, U.S. DISTRICT COURT

| United States of America | ) |
|---|---|
| v. | ) |
| Eduardo Galdean Gress (01)<br>Lorenzo Piedra Chavez (02)<br>Blanca Flor Hernandez (03) | )<br>)<br>)<br>)<br>) |

Case No. 3:20-MJ-677-BK

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of 7/06/2020 in the county of Dallas in the Northern District of Texas, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

See attached affidavit of DEA TFO Hunter Palmer

☑ Continued on the attached sheet.

*Complainant's signature*

Hunter Palmer, TFO, DEA
*Printed name and title*

Agent sworn and signature confirmed via reliable electronic means, pursuant to Fed. R. Crim. P. 4.1.

Date: 07/07/2020

*Judge's signature*

City and state: DALLAS, TEXAS

RENEE HARRIS TOLIVER, U.S. MAG. JUDGE
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Hunter Palmer, after being duly sworn, depose and say as follows:

### I. Introduction

1.  My name is Hunter Palmer, and I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct criminal investigations and to make arrests for federal felony offenses. I am a Task Force Officer with the Drug Enforcement Administration of the United States Department of Justice and have been so employed since February 2017. I am currently assigned to the Dallas Field Division Office. In that capacity, I investigate violations of the Controlled Substances Act (Title 21 USC § 801, *et seq*.). I have completed DEA Basic Task Force Officer Orientation. I have attended numerous schools and courses in relation to large-scale drug trafficking organizations. As a result of my training I am familiar with investigating drug trafficking organizations, their methods of importation and distribution of controlled substances, and financial investigations.

2.  In addition, I have participated in numerous complex investigations and in numerous arrests and search warrants. I have written affidavits in support of court-authorized federal warrants and orders for search warrants, GPS tracking of telephones and vehicles, pen registers, trap-and-trace devices, and T-III intercepts of wire communications. In my role as a Task Force Officer for the Drug Enforcement Administration, I have negotiated for and purchased narcotics using multiple

**Affidavit - 1**

Confidential Sources. I have also participated in high-level investigations of significant drug cartels, and as a result, I have an understanding of the manner in which narcotics are distributed and the various roles played by individuals and groups in their distribution. I have conducted numerous interviews of drug traffickers of various roles within these illicit organizations, which has also provided me with a greater understanding of the methods by which drug trafficking organizations operate.

3. I am familiar with common methods of investigating drug trafficking and manufacturing organizations, and have become familiar with their methods of importing, exporting, storing, concealing, and packaging drugs; their methods of transferring and distributing drugs; their use of cellular telephones and telephone; their use of numerical codes, code words, and counter surveillance; and other methods of avoiding detection by law enforcement. I am also familiar with the various methods of packaging, delivering, transferring, and laundering drug proceeds. Additionally, through my training and experience, I can identify illegal drugs by sight, odor, and texture.

## II. Background

4. I have probable cause to believe that **Eduardo Galdean Gress, Lorenzo Piedra Chavez** and **Blanca Flor Hernandez** have violated 21 U.S.C. § 841 (a)(1), that is, possession with intent to distribute and the distribution of heroin, a Schedule II controlled substance.

Affidavit - 2

5.  My knowledge of the facts alleged in this affidavit arise from my personal participation and observations in this investigation, my interviews of informants, and my review of reports prepared by investigators of the DEA Dallas Field Division and other participating law enforcement officers. Since this affidavit is limited to establishing probable cause, I have not included every fact known to me and other investigators.  Rather, I am only submitting the facts necessary to establish probable cause that **Eduardo Galdean Gress, Lorenzo Piedra Chavez** and **Blanca Flor Hernandez** possessed with the intent to distribute heroin.

### III. Probable Cause

6.  In January 2020, agents began investigating a Drug Trafficking Organization (DTO) in the Dallas, Texas area responsible for the acquisition of wholesale quantities of heroin from Sources of Supply in Mexico. As part of the investigation, agents have conducted extensive analysis of call detail records regarding known target telephones used by multiple co-conspirators.  Additionally, agents regularly debrief Confidential Sources, Cooperating Defendants, and other Case Agents conducting concurrent, overlapping investigations.

7.  During the investigation, agents identified 4103 Rockford Drive, Dallas, Texas as possible heroin stash house used by the DTO to store and distribute large amounts of heroin.

**Affidavit - 3**

8. On July 2, 2020, the honorable, Irma C. Ramirez, signed an order and affidavit concerning the search of the residence located at 4103 Rockford Drive, Dallas, Texas.

9. On July 6, 2020, agents established surveillance in the area of 4103 Rockford Drive, Dallas, Texas.

10. After a period of time, agents observed **Eduardo Galdean Gress** (hereinafter **Gress**) and another male, who was later identified and is known here as F.P., exit the front door of the residence and close the door behind them.

11. Agents observed both **Gress** and Paz enter a white Chevrolet Silverado that was parked in the driveway of the residence. Agents observed the Chevrolet Silverado depart the residence traveling through the neighborhood.

12. Agents maintained surveillance on the Silverado as it traveled to a parking lot located at 1120 S. Westmoreland Road, Dallas, Texas. Agents observed that both **Gress** and F.P. remained in the Silverado as if they were waiting for something.

13. A short time later, agents observed a blue Chevrolet SUV park next to the Chevrolet Silverado that was occupied by **Gress** and F.P. Agents observed a male, later identified as **Lorenzo Piedra Chavez** (hereinafter **Chavez**), get out of the driver seat of the SUV and get into the passenger seat of the Silverado.

14. Agents observed that **Chavez** was in the vehicle for approximately 30 seconds before exiting and getting back into the driver seat of the Chevrolet SUV.

**Affidavit - 4**

Agents observed both the Silverado and the SUV depart the location immediately after.

**Affidavit - 5**

15. Based on training and experience and the knowledge gathered during this investigation, agents believed that they had just witnessed a drug transaction between the occupants of both vehicles. At this time, surveillance was split into two teams, and certainAgents followed the Chevrolet SUV and others followed the Chevrolet Silverado.

16. A Texas Department of Public Safety (DPS) Trooper was directed to the location of the Chevrolet SUV. The Trooper conducted an investigative stop on the vehicle at the direction of agents. After the vehicle stopped, the Trooper approached the vehicle and contacted **Chavez**, who was the driver, and **Blanca Flor Hernandez** (hereinafter **Hernandez**) who was the front seat passenger.

17. The Trooper noticed that there were also three children in the back seat of the Chevrolet SUV, two of which appeared to be very small under the age of three.

18. During the stop, both **Chavez** and **Hernandez** provided verbal consent to search the vehicle and its contents. The Trooper asked both **Chavez** and **Hernandez** to exit the vehicle and to take the kids outside the vehicle so he could search the vehicle. **Hernandez** attempted to grab her purse and take it out of the car but the Trooper asked her to leave it in the car, which she did.

19. The Trooper began a search of the vehicle and observed that inside the **Hernandez's** purse there was a heavy square shaped bundle wrapped in brown packing tape and clear cellophane.

Affidavit - 6

20.     The Trooper opened the package and observed a hard-brown substance that was believed to be heroin.  The substance was later field-tested and produced a positive result for the presence of heroin.

21.     **Hernandez** denied any knowledge of the heroin in her purse and she did not know how it got there. Both **Hernandez** and **Chavez** were detained at this point and declined speaking with agents about the heroin.

22.     Agents later weighed the package containing the heroin and the gross weight was 1055.9 gross grams.

23.     At the same time, agents directed another marked Midlothian Police K-9 unit to the location of the Chevrolet Silverado occupied by **Gress** and F.P.  Agents directed the marked Police unit to the vehicle's location and directed the Officer to stop the vehicle so F.P. and **Gress** could be detained prior to agents executing the search warrant at 4103 Rockford Drive, Dallas, Texas.  The marked unit stopped the Chevrolet Silverado and both **Gress** and F.P. were detained at this time.

24.     Agents then traveled back to 4103 Rockford Drive, Dallas, Texas and executed the search warrant at the location.  Agents secured the location and began a systematic search of the residence and, as discussed in greater detail below, seized multiple items of evidentiary value, including a large amount of heroin, firearms, ammunition, and large amounts of U.S. currency.

**Affidavit - 7**

25. Agents observed that all of the items of evidentiary value were located in the back bedroom and the back bedroom's closets and adjacent office connected to the back bedroom. No items of evidentiary value were located in any other rooms.

26. In a closet in the back-bedroom, agents located an additional four bundles of a brown substance that was wrapped in the same manner as the bundle found with **Hernandez** and **Chavez**.

27. The substance was field-tested and produced a positive result for the presence of heroin. The four bundles were later weighed and the total weight for all four bundles was 4,445.5 grams. In the same closet, Agents located a two semi-automatic "assault" rifles and with hundreds of rounds of ammunition. Agents observed that both rifles were loaded with live ammunition in the chambers.

28. In an office attached to the back bedroom, Agents located multiple discarded wrappings with heroin residue on them. Agents observed that the wrappings were identical to the wrapping around the four bundles found in the closet and the one bundle found with **Chavez** and **Hernandez**. Agents also located a large amount of U.S. currency scattered around the back bedroom of the residence. Agents also located and seized a Taurus 9mm handgun on top of the bed in the back bedroom.

29. After the residence was secured, agents spoke to **Gress** outside the residence. Agents read **Gress** his *Miranda* warnings and **Gress** advised that he understood his rights. **Gress** told Agents that he rents out the back half of the

Affidavit - 8

residence located at 4103 Rockford Drive, Dallas, Texas. **Gress** advised that nobody else in the residence goes into his side of the residence.

30. **Gress** advised that the heroin, guns and money inside the location were all his and that F.P. had nothing to do with it.

31. **Gress** told Agents that he asked F.P. to give him a ride to the parking lot where he met **Chavez** and provided **Chavez** with the bundle of heroin.

32. **Gress** advised that he has delivered a kilogram of heroin to **Chavez** on three separate occasions in the past months. Agents asked **Gress** where he got the heroin and, at that time, **Gress** advised that he would rather have an attorney present to answer any further questions.

33. Agents then spoke to F.P. who advised that **Gress** gave **Chavez** a package from the back seat of the vehicle and **Chavez** got back into his vehicle and they both left the location.

[remainder of page left intentionally blank]

Affidavit - 9

34. Based on the investigation to date, **Gress, Chavez** and **Hernandez** are members of the DTO within the Northern District of Texas. Moreover, I believe **Gress, Chavez** and **Hernandez** knowingly and intentionally possessed heroin with the intent to distribute, in furtherance of their involvement in the DTO.

_____
Hunter Palmer
Task Force Officer
Drug Enforcement Administration

Agent sworn and signature confirmed via reliable electronic means, pursuant to Fed. R. Crim. P. 4.1.

Sworn to before me on July 7, 2020.

_____
Renee Harris Toliver
United States Magistrate Judge
Northern District of Texas

Affidavit - 10